Birchard, Judge.
This bill raises the question, whether Tannehill’s entry, No. 1326, was too vague and uncertain to appropriate the land claimed by respondents. This supposed vagueness arises from alleged defects in the entry of Thos. Jones and others, No. 1269, on which entry No. 1326, depends. Entry No. 1269, bears date Aug. 16, 1787. Tannehill’s entry, No. 1326, bears date Aug. 17, 1787 ; and Clemson’s entry. No. 2771, under which complainants claim, covers 419|- acres of the land embraced by entry No. 1326, and bears date Feb. 27, 1797. Upon the simple question of priority, the respondents have the preference, and the elder patent upon the junior entry, would be forced to yield to the elder entry, to the extent of the conflict between the two.
Entry No. 1269, is in these words; “Thos. Jones, etc., enter 1000 acres on,” etc., “ on the lower side of Brush creek, beginning at a cherry tree, marked T, supposed about ten miles above Todd’s road, running thence west 400 poles, and, from each end of this line, north, for quantity.” On the circuit, and upon trial of the original cause, it seems the Judges who tried it were, upon a careful consideration of the testimony, satisfied that the starting point for Jones’ entry, to wit., the c-herry tree, was sufficiently identified as a localive call, and that the general * call was an object of such notoriety, and suffi- [75 ciently accurate, to enable any subsequent locator, exercising proper diligence and caution, to find the entry, and avoid an interference.
Upon review we should, as a rule of practice, treat such finding, upon the facts, with not less respect than we would the finding of a jury, upon a matter of fact fairly submitted to them; and we would not reverse that finding, upon a mere difference of opinion as to the weight of the evidence. If the party thought the facts of the case wrongly determined, he should have asked a rehearing, rather than pursue a bill in the nature of a writ of error. But, with the finding of the facts in this ease, we are not dissatisfied. The proof seems to sustain it. The cherry tree, standing on the lower side of Brush creek, distinctly marked so as to be seen at some distance by a person passing up that side of the creek, is established by the testimony. Brush creek, and the crossing of Todd’s road, were objects of noto *76 riety at the date of the entry. This crossing is found, by actual survey, to be thirteen miles and ten poles, in a right line, from the marked eherry tree. Following the meanderings of the stream the distance is still greater, as is shown by the survey. It is urged, that this disparity is so great as to render the entry invalid. In determining whether this position is well taken, let us consider, first, what a subsequent locator would have understood from the descriptive words of this general call, “ supposed to be about ten miles above Todd’s road.” In the first place the distance would not be understood to have been precisely ascertained. The language used would warrant no such inference. “ Supposed ” indicates, very clearly, that the distance was put down, not from actual measurement, but as a matter of opinion, either of the locator, or those who were possessed of some general knowledge of distances in that part of the forest. Again, would he have been misled by the greater distance, as found by meandering the stream ? Undoubtedly this would have been the case if Brush creek had been a large stream, and the usual route of travel were upon its 76] banks ; for, in that case, the subsequent * locator would have so understood the distance to have been estimated. The stream, however, is small and fordable, and irregular in its course, and its banks were not the route traveled; hence the subsequent locator would, necessarily, have understood the distance given, to be a supposed distance of about ten miles, by a direct line, from Todd’s road to the cherry tree, called for as Jones’ first corner. The tree being, then, an object of notoriety, marked, and standing on the west bank of the creek, reasonable diligence and care would have enabled Clemson, in 1797, after the entry was surveyed, to discover the 1000 acre tract. The ten miles would have brought him into the neighborhood. About ten miles, which, as distances are usually estimated ia the woods, may mean twelve or more, would have brought him on to the stream at a point where, if he followed the right bank upward, he could not have gone far enough to include the area required to fill his warrants, without, necessarily, coming upon the marked cherry, which was well known to other locators at that time.
In Johnson v. Pannel’s heirs, 2 Wheaton, 206, it is held “that entries, made in a wilderness, most generally refer to some prominent and notorious natural object, which may direct the attention to the neighborhood in which the land is placed, and then to some particular object exactly describing it. The first of these is denominated the general or descriptive call, and the last the particular or locative call *77 of the entry. Reasonable certainty is required in both; if the descriptive call will not inform a subsequent locator in what neighborhood he is to search for the land, the entry is defective unless the particular object is one of sufficient notoriety. If, after having reached the neighborhood, the locative object can not be found within the limits of the descriptive calls, the entry is also defective. A single call may, at the same time, be of such a nature as to constitute, within itself, both a call of description and location.”
Subsequent locators are bound to use care. If they overlook an elder entry it is their own fault, provided the calls of that entry be such that, with reasonable care, they might have * identified the [77 land appropriated. There seems, from the testimony, to have been no difficulty on this point.
In the case of Garnet and others v. Jenkins and others, 8 Peter, 75, the court remark : “ Some of the witnesses say that, being at Bryant’s Station, with the calls of Garnet’s entry to direct them, they could have found his land on Lecompt’s Run without difficulty. If this were correct, the entry must be sustained, for it is the test by which a valid entry is known.” Now, it is stated by Wade, in the ease at bar, that “ any one wishing to find the beginning corner' of Jones and others’ entry, with a copy of the entry in his hands, could not fail to find the cherry tree, marked T, called for as the beginning corner.” It is stated by this witness, who was present when Jones’entry was surveyed, in 1793, four years before Olemson’s entry, that no difficulty was experienced in finding the chérry tree called for ; and it would appear from his testimony, and that of Yincenhaler, that this tree was notorious, and the locators of that period well acquainted with its position.
A second objection is, that the location, as now claimed, embraces land on both sides of the stream.
If this was the manifest intention of Jones, the objection is not a serious one. What his intention was, is to be gathered from the entry, which should be favorably construed. We must take into consideration the whole entry, and thus gather the intention. The description given, is: “ Beginning at the cherry tree, marked T, (which stands on the lower side of Brush creek,) running thence west 400 poles, and from each end of this line, north, for quantity.” Would a surveyor meet with difficulty in running this tract of land? The base line is given. It is a line 400 poles in length, drawn west from the cherry tree. The side lines are each 400 poles, to be drawn at right angles, *78 on the extremities of the base ; and a line, parallel to the base, drawn to intersect the side lines at their northern extremities, closes the survey. Where is then the difficulty, admitting that Brush creek divides the tract ? It was a stream that afforded no obstacle to the survey of this, or of any adjacent entry. Its banks are not the boundaries of 7§] any of the then unascertained Clines. It is called for or needed, only, to determine the starting point. But preceding this specific description, are the words: “Jones, etc., enter 1000 acres on the lower side of Brush creek.” Hence the claim, that the entire tract must be found on that side of the creek. Were the stream navigable, and the descriptive calls of the entry less certain, the discrepancy might create a serious difficulty. Yet, take the whole entry together, and apply to it the facts of the case, and the intent of the party could be gathered with certainty,by regarding attentively the specific boundaries. The general call for the lower side of the creek must yield to them.
In Massie v. Watts, 6 Cranch, 148, it was hold, that if a location have certain material calls sufficient to support it and to describe the land, other calls less material, and incompatible with the essential calls of the entry, may be discarded. The rectangular figure is to be preserved, if possible. Yet, if this were not so, the entry would be good for all that portion of Jones’ survey lying west of the creek, and that is all that is necessary to fix the starting point of Tannehill’s entry.
The remaining objection, is, that the entry of Jones is on Brush creek; whereas the actual location is on the East Fork of Brush creek. The question upon this poiut is, not which branch is the main stream ; not which is the largest or longest, nor what is the name they now bear; but, simply, what stream at the time was known as Brush creek? The proof tends to show, that what is now called the East Fork was, in 1787, supposed and reputed to be the main branch of the stream, and was so considered, in 1797, when John Clemson made his entry. It was so found upon the circuit. With that finding we are satisfied.
Bill dismissed.